**In the Matter of the CARE AND TREATMENT OF William T. BARLOW, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 65969.**

Missouri Court of Appeals, Western District.

Feb. 13, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 25, 2008.

Application for Transfer Denied May 20, 2008.

Emmett D. Queener, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. General, Alana M. Barragan–Scott, Asst. Atty. General, Jefferson City, for respondent.

Before PAUL M. SPINDEN, P.J.,
PATRICIA BRECKENRIDGE,[1] and
JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

William T. Barlow appeals the judgment of the Probate Division of the Jackson County Circuit Court committing him to secure confinement in the custody of the Department of Mental Health (DMH) as a sexually violent predator (SVP). The judgment is affirmed.

## Background

Barlow[2] was found in 1973 to be a criminal sexual psychopath (CSP) under section 202.700 RSMo (repealed in 1980).[3] He was committed to the care of the Division of Mental Diseases at State Hospital No. 1 in Fulton, Missouri. He has relocated several times and most recently was located at the Northwest Missouri Psychiatric Rehabilitation Center. Barlow participated in a work release program for twelve to thirteen years.

In the year 2000, a multidisciplinary team designated under section 632.483[4] performed an SVP assessment on Barlow. A prosecutor's review committee determined that Barlow met the definition of an SVP under the statute. On August 21, 2000, the Attorney General filed a petition in the probate court of Jackson County seeking to commit Barlow under the Sexually Violent Predator Act. The court found probable cause to proceed to trial on October 11, 2000. In April of 2001, Barlow

filed a motion for summary judgment, challenging the sufficiency of the evidence. The probate court denied this motion.

In June of 2002, Barlow filed a motion to dismiss the petition for lack of jurisdiction. Barlow claimed that the probate court did not have jurisdiction because he was still under the jurisdiction of the Circuit Court of Jackson County under the Criminal Sexual Psychopath Act. The probate court agreed and granted Barlow's motion, finding that it did not have jurisdiction under the doctrine of "concurrent jurisdiction."

The Attorney General appealed to this court. *In the Matter of the Care and Treatment of Barlow v. State,* 114 S.W.3d 328 (Mo.App.2003). We vacated the dismissal and remanded the case, finding that the probate court did have jurisdiction. *Id.* at 335. We found that the doctrine of concurrent jurisdiction did not bar the probate court's jurisdiction because the SVP Act specifically directs that those committed under the CSP Act may be adjudicated an SVP. *Id.*

After the matter was remanded to the probate court, Barlow filed a motion to dismiss under section 632.492. Barlow argued that his trial setting was not timely under section 632.492 and that, therefore, the probate court had lost jurisdiction to proceed. The probate court denied the motion and set the case for trial. A jury trial was held from April 12, 2005, to April 15, 2005. The State put on two witnesses,

---

1. Breckenridge, J., was a member of this court at the time the case was argued and submitted. She was subsequently appointed a judge of the Supreme Court of Missouri but has been reassigned to this court as a special judge for the purpose of disposition of this case.

2. Mr. Barlow was formerly known as "William Stitt."

3. Although section 202.700 was repealed in 1980, section 632.480(5)(b) RSMo, cum. supp. 2005, provides that a person who had been committed as a criminal sexual psychopath may be adjudicated to be a sexually violent predator.

4. Unless otherwise noted, all references are to the Revised Statutes of Missouri, cumulative supplement 2005.

Dr. Richard Gowdy and Dr. Harry Hoberman.

Dr. Richard Gowdy is the Director of Forensic Services for the DMH. He reported that Barlow was at one of the DMH facilities and was on a court-ordered work release, which allowed him to work in the community during the day and to come back to the hospital to stay at night. He was also allowed to have some weekend visits with his brother.

Dr. Gowdy testified that Barlow has murdered three women. Two of the murders involved being in cars. Because of this, Barlow was specifically prohibited from riding in cars with females. Sometime in early 1999, it was reported that Barlow was seen getting into a car with two females, one of whom was a minor. At that point, he was no longer permitted to have the weekend visits with his brother.

The DMH learned that Barlow was observed in a restaurant, which violated two conditions of his work release. Barlow had been given a ten-block radius in which he could travel for lunch, and he was also not permitted to be in a place where alcohol was served. The restaurant served alcohol and was out of the ten-block radius. When Barlow violated these two conditions of his work release, the work release was revoked. During the investigation of the restaurant incident, the facility also discovered that Barlow had purchased at least one, possibly two, motorcycles and one car. All were titled in his brother's name. Barlow had not informed the hospital about these purchases. This raised concerns for the hospital, because secrecy and non-disclosure are characteristics of sex offenders who have not been successfully treated. Moreover, it raised concerns that he was procuring the means to escape from the facility. As a result of these incidents, Barlow was transferred to a facility with higher security. Dr. Gowdy also reported that in 1992, Barlow had sent a pornographic videotape to a female patient within the facility. The videotape depicted scenes involving sexual bondage.

The State's second witness was Dr. Harry Hoberman. Dr. Hoberman is a psychologist who reviewed Barlow's records in order to make a determination of whether or not he was an SVP. Dr. Hoberman admitted that he has never met or spoken with Barlow himself. Dr. Hoberman said, in his opinion, Barlow qualified as an SVP under the statute. He specifically stated that Barlow suffers from two mental abnormalities, sexual sadism, which is a type of psychosexual disorder, and antisocial personality disorder. Dr. Hoberman described sexual sadism as a disorder where a person is sexually excited by sexual fantasies, urges, or behaviors involving acts in which the victim experiences psychological or physical suffering (including humiliation).

In explaining his diagnosis, Dr. Hoberman pointed to several matters. As early as second and third grade, Barlow reported that he thought about torturing girls with sharp instruments, and in sixth grade, he reportedly grabbed girls, waited in an alley with a knife, and on at least two occasions waited outside a girls' bathroom with a knife. In the ninth grade, he stabbed a girl in the back with an ice pick.

In 1956, Barlow strangled a woman in Germany with a scarf. He admitted that he had sexual intercourse with her corpse after strangling her to death. Barlow has twice been married.[5] In 1966, Barlow stabbed his first wife in the chest. He

---

**5.** Mr. Barlow married for the first time after he committed the murder in Germany. Mr. Barlow has since divorced both wives.

acknowledged that he had to hit his wife before he was able to achieve orgasm while having sex with her. His first wife also reported having awakened from sleep to find herself tied to the bed. Barlow also reported to certain mental health officials that he had thoughts about hurting his wife. Another incident in 1966 involved Barlow stabbing a woman in the shoulder.

In January of 1971, Barlow reported he was having sadistic sexual fantasies and becoming increasingly aroused and was driving around thinking about hurting someone. He cut off a woman in his car and then went to her car and stabbed her to death. It was also reported that around that time he was driving around looking for hitchhikers and thinking about having sex with them.

In January of 1972, Barlow was again reportedly driving around looking for someone to hurt and drove by a laundromat where he saw a young woman folding clothes. Barlow went into the laundromat and stabbed her several times with a kitchen knife, killing her. When asked why he did it, he reportedly said, "What else could I do? It's like a kid walking by a candy store."

In August of 1972, Barlow saw a young woman about 18 years of age whose car had broken down on the side of I–35. He stopped and offered to give her a ride. He then drove her to Cass County in his car, forced her to undress in the car, had her walk to the middle of a field, then raped her and stabbed her, and then left her in the field. She survived this attack.

Dr. Hoberman also suggested that sexual sadism is chronic and does not disappear spontaneously. He pointed to several things that indicated to him that Barlow's sexual sadism was still present. He identified the pornographic videotape which Barlow had sent to a female resident in the facility where he was housed. He also

mentioned that Barlow had sent a letter to another female patient in the facility describing his criminal sexual history. Dr. Hoberman also stated that it came to the facility's attention in 1995 that Barlow had two CDs of sexual imagery. He noted that in a 1992 report, one of the doctors who treated Barlow compared Barlow's sexual sadism to the characteristics that the FBI profiles for serial killers.

Dr. Hoberman noted that in the reports he viewed, doctors and social workers had characterized Barlow as suffering from sexual sadism as recently as December of 2000. He also noted that Barlow had told evaluators that he "could not stop" and evaluators had indicated that there was concern about Barlow's ability to control his impulses. In the 1990s, Dr. Hoberman also described an incident that occurred during Barlow's work release where Barlow gave women's underwear to two waitresses at a restaurant he frequented. Dr. Hoberman identified this as a "sexualized act" which indicated that Barlow was still having deviant sexual thoughts.

Dr. Hoberman indicated that he believed Barlow was more likely than not to commit future acts of sexual violence. He indicated that past behavior is the best predictor of future behavior. Dr. Hoberman looked at three different actuarial tools to assess the likelihood that Barlow would reoffend, the Static 99, the Minnesota Sex Offenders Screening Tool (MnSOST–R), and the Sex Offender Appraisal Guide (SORAG). The Static 99 indicated that Barlow had a 52% likelihood of being reconvicted of a sex offense over a fifteen-year time period. The MnSOST–R indicated that Barlow had a 57% likelihood of being rearrested for a sex offense over a six-year time period. The SORAG indicated that Barlow had a 58% probability of violently reoffending over a seven-year time period, an 88% likelihood in ten years, and a 63% chance

in just five years. These were not the only studies that Dr. Hoberman examined; other studies also indicated a high-risk factor for Barlow.

Dr. Hoberman indicated that his lack of offenses while in the community on a work release was not an indication of a lower risk, because he was closely monitored during that time and because, even while he was monitored, he pushed the limits by doing things such as eating at a restaurant outside his ten-block radius, giving women's underwear to waitresses, buying vehicles without informing the hospital, and riding in cars with females in violation of his restrictions. He indicated that Barlow's tendency to test the limits of his release and see how much he can get away with indicates that Barlow has trouble controlling his behavior and complying with rules set for him. He also indicated that it was a concern for him that Barlow rarely, if ever, expressed any guilt or remorse for the acts of violence he had committed in the past.

Dr. Hoberman also indicated that Barlow's treatment over the years did not make his risk lower, because the treatment he had received over the years was not targeted specifically toward preventing recidivism in sex offenders. Moreover, there was no evidence indicating that Barlow was improving. He also indicated that Barlow's high IQ makes it more likely that Barlow is able to fool or manipulate people, including therapists, which increases the risk that he could be perceived as having improved when, really, he has not improved and is merely saying what he knows the evaluators want to hear.

Barlow also put on several witnesses. He introduced testimony from Kendall Randolph, Dr. Robert Prentky, Dr. David Hunter, James LaBundy, and Dr. Gregory Sisk. Their testimony was generally favorable to the defense's theory that Barlow was not an SVP. Because the judge rejected their testimony, it is summarized only briefly.

Kendall Randolph, who worked with Barlow while Barlow had his work release, indicated that Barlow was a good employee and had been promoted to production manager. Randolph was not aware of any problems with Barlow's behavior.

Dr. Robert Prentky examined Barlow's records and interviewed Barlow. Dr. Prentky indicated that he thought it would be difficult to diagnose Barlow with sexual sadism because many of Barlow's crimes had no sexual element to them. Dr. Prentky also indicated that other actions, such as sending the pornographic video to another female patient and giving women's underwear to waitresses, indicate poor judgment, but not sexual sadism. He also indicated that it appeared from the record that other doctors have had trouble with firmly diagnosing Barlow with sexual sadism.

Dr. Prentky specified that he was not saying Barlow had no mental abnormality, but that he just was unable to diagnose Barlow with any specific disorder recognized in the psychological community. The closest diagnosis Dr. Prentky could specify was a personality disorder not otherwise specified. Dr. Prentky stated that he did not believe Barlow met the definition of a sexually violent predator, and he did not think Barlow was likely to reoffend.

Dr. David Hunter is a psychiatrist who works for DMH. Dr. Hunter was charged with Barlow's care when he initially entered Guhleman Center in April of 2000. Dr. Hunter indicated that he believed that Barlow could no longer be diagnosed with sexual sadism. He also indicated that he was reluctant to diagnose Barlow with antisocial personality disorder because a per-

sonality disorder is such a serious diagnosis, but he did conclude that Barlow had displayed adult antisocial behavior.

James LaBundy, the chief of sex offender services for the Missouri Department of Corrections, conducted some group therapy from 1993 to 1998 in which Barlow participated. He indicated that Barlow responded well to treatment, and that Barlow did not blame other people for his mistakes or deny his past actions. Mr. LaBundy did not believe that Barlow's pornographic videotape was indicative of deviancy.

Dr. Gregory Sisk, a clinical psychologist, was engaged by Barlow's defense counsel. Dr. Sisk diagnosed Barlow with sexual sadism, but had trouble arriving at that diagnosis because some of Barlow's actions indicated that he did not want to stay and watch his victims suffer. This was unusual, because most people suffering from sexual sadism are aroused and excited by watching their victims in pain. He also diagnosed Barlow with a personality disorder not otherwise specified, which meant that Barlow had a personality disorder but he showed features of more than one type of personality disorder, including avoidant personality disorder, antisocial personality disorder, and paranoid personality disorder. Dr. Sisk indicated that he believed that Barlow had the tendency in the past to commit sexually violent offenses, but that he no longer has serious difficulty controlling his urges.

Dr. Sisk did not consider the pornographic videotape to be a concern. He also believed that the incident in which Barlow gave underwear to two waitresses was not a concern. He noted that affidavits obtained from the waitresses indicated that they took it as a joke. Dr. Sisk believed that Barlow had shown remorse for his actions and wanted to make up for them.

The jury retired to deliberate, but could not reach a verdict even after much deliberation and after the court gave the jury the "hammer" instruction.[6] Concluding that the jury could not reach a verdict, the court declared a mistrial. The parties then, by joint motion, waived a jury trial and submitted the case for a bench trial on the evidence already adduced during the jury trial. The probate court found that Barlow was an SVP and ordered his commitment to the DMH. Barlow now appeals.

## Fear of Reoffense

Barlow's first point relied on reads, in relevant part, as follows:

> The probate court erred in committing Mr. Barlow ... as a sexually violent predator ... because the commitment serves only as general deterrence to guarantee the impossibility of reoffense in that it is based upon fear of what he could do if allowed access to the community rather than upon proof beyond a reasonable doubt of what he is more likely than not to do if allowed access to the community.

---

6. Jury instructions were not provided to this court. The instruction given by the court as recited in the transcript was:

   You should make every reasonable effort to reach a verdict as it is desirable that there be a verdict in every case.

   Each of you should respect the opinions of your fellow jurors as you would have them respect yours and in a spirit of tolerance and understanding endeavor to bring the deliberations of the whole jury to an agreement upon a verdict.

   Do not be afraid to change your opinion if the discussion persuades you that you should, but a juror should not agree to a verdict that violates the instructions of the court, nor should a juror agree to a verdict finding respondent to be a sexually violent predator unless he is so convinced beyond a reasonable doubt.

We understand this to be an argument that the court committed him, not based on evidence that proved he met the statutory requirements of being an SVP, but on the basis of fear of the possibility that he might reoffend. It is in essence a "passion and prejudice" argument. He argues that a finding based on such fear, rather than on statutory criteria, violated Barlow's right to due process of law.

Barlow's argument assumes that the court's decision was based on fear that he might reoffend. The only thing Barlow points to as evidence is the fact that after Dr. Rabun [7] examined Barlow and concluded he was not an SVP, the State hired Dr. Hoberman, who opined that Barlow was an SVP. That evidence certainly does not show that the trial court did not properly analyze the evidence.

■ We also find no authority for the proposition that it is wrong for the State to engage another expert to give an opinion consistent with the result it is seeking. The State is expected to be reasonable and fair, not deceitful or underhanded; but the State performs the function of representing the interests of the state and its citizens in exercising its discretion and choosing to initiate and pursue an action. *See State v. Storey,* 901 S.W.2d 886, 904 (Mo. banc 1995) (Robertson, J., concurring in part and dissenting in part) ("It is not the obligation of . . . the state . . . to abandon the role of advocate in favor of a position of neutrality."); *see also State v. Walton,* 899 S.W.2d 915, 919 (Mo.App.1995) ("As the state's advocate, [the prosecutor] attempts to persuade the jury to the state's position."). It is true that an SVP proceeding is not a criminal prosecution, but the point remains that the State's repre-

sentatives still perform their designated functions in the adversary proceeding. If the State were required to blindly accept the opinions of an expert that it had engaged, it would allow the expert to be the final judge of the issues, rather than the jury or judge.

As for the suggestion that the court's decision was somehow based on things other than the law and the facts, we can only say that the record is devoid of any hint that the court did not objectively and studiously apply the law and consider the evidence.

### Sufficiency of the Evidence

■ Barlow's second point argues that the evidence was insufficient as a matter of law to conclude that he was more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility. Section 632.480(5), in relevant part, defines a "sexually violent predator" as:

> any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility and who:
>
> . . . .
>
> (b) Has been committed as a criminal sexual psychopath pursuant to section 632.475 and statutes in effect before August 13, 1980.

Barlow challenges only the finding that he is more likely than not to engage in predatory acts of sexual violence if not confined. All of the experts at the hearing indicated that they believed Barlow had a mental abnormality of some kind, even if they were not able to define it. Barlow's ex-

---

7. Dr. Rabun was one of the doctors who treated Mr. Barlow at the facility where he stayed. Dr. Rabun did not testify at trial. His reports on Mr. Barlow were reviewed and used by other experts who did testify. The record is unclear as to Dr. Rabun's first name.

perts indicated that they did not believe he was likely to reoffend, while the State's experts believed he was likely to do so.

▉ In an SVP case, our review is limited to a determination of whether there was sufficient evidence admitted from which a reasonable factfinder could have found each necessary element beyond a reasonable doubt. *In re Care & Treatment of Francis,* 159 S.W.3d 873, 875 (Mo. App.2005). We do not reweigh the evidence. We determine only whether the judgment was supported by sufficient evidence. *Id.* Matters of credibility and weight of testimony are for the factfinder to determine. *Id.* For this reason, we view the evidence in the light most favorable to the judgment, accepting as true all evidence and reasonable inferences favorable to the judgment and disregarding all contrary evidence and inferences. *Id.* However, we will not give the State the benefit of any unreasonable, speculative, or forced inferences, nor will we supply any missing evidence. *Id.* at 875–76. We will reverse a judgment based on insufficiency of the evidence only if there is a complete absence of probative facts supporting the judgment. *Id.* at 876.

Barlow acknowledges that Dr. Hoberman diagnosed him as having sexual sadism and stated his belief that Barlow was more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility. However, Barlow argues that this was insufficient to support the judgment.

Barlow fails to show that Dr. Hoberman's diagnosis was not based on a proper legal foundation and should have been excluded from evidence. Dr. Hoberman looked at three different assessment tools to assess the likelihood that Barlow would reoffend. All three supported the conclusion that Barlow was more likely than not to reoffend.

Although Barlow's last act of violence occurred somewhere around thirty-three years ago, Barlow had been under the supervision of the DMH during that entire period. Barlow points to the twelve to thirteen years that he spent in the community work release program without committing any acts of violence. This is tempered by the fact that Barlow, although permitted to work in the community, remained under heavy supervision and was given many limits to his freedom. Dr. Hoberman indicated that his lack of offenses while in the community was not an indication of a lower risk, because he was closely monitored during that time. In addition, while he was under this supervision, he committed acts that were questionable, such as eating at a restaurant outside his ten-block radius, giving women's underwear to waitresses, obtaining a pornographic videotape and giving it to another female patient, possessing other kinds of pornography, buying vehicles without informing the hospital, and riding in cars with females in violation of his restrictions. Although many of these acts are not sexual in nature, they show Barlow's disregard for the authority of the hospital and his tendency to see how much he can get away with. Dr. Hoberman's opinion was that Barlow's tendencies indicate that Barlow has trouble controlling his behavior and complying with rules set for him.

Dr. Hoberman also stated that Barlow's treatment over the years also did not make his risk lower, because the treatment he had received over the years was not targeted specifically toward preventing recidivism in sex offenders.

The court was free to believe Dr. Hoberman and disbelieve the testimony of Barlow's experts who said he was not likely to reoffend. *See id.* at 875 ("The credibility and weight of testimony are for the fact-

finder to determine. The fact-finder may believe all, some, or none of the testimony of a witness[.]"). Barlow's arguments about the fallacies of Dr. Hoberman's reasoning are nothing more than an attempt to have us reweigh the evidence in his favor. We cannot do so. The evidence was sufficient for the probate court to find that Barlow was an SVP. Barlow's second point is denied.

### Compliance with Section 632.492

Barlow's third point argues that the probate court erred when it denied Barlow's motion to dismiss for failure to comply with section 632.492. Statutory interpretation is a question of law, which we review *de novo*. *State v. Wiley*, 80 S.W.3d 509, 511–12 (Mo.App.2002).

Upon the filing of a petition to adjudicate whether a person is an SVP, the court must determine whether probable cause exists to believe that the person named in the petition is an SVP. Section 632.489. Within sixty days after such determination is made, the court is directed to conduct a trial to determine whether the person actually is an SVP, according to section 632.492.

In this case, the court found probable cause to proceed to trial on October 11, 2000. Trial was not held until April 12, 2005, well after the sixty-day window had passed. However, Barlow acknowledges that this delay was caused by various defense efforts, including his motion for summary judgment filed April 3, 2001, and his motion to dismiss the petition for lack of jurisdiction filed June 19, 2002, which was later appealed (and the matter was later remanded to the probate court). Barlow argues, however, that the instruction in section 632.492 that the court "shall conduct a trial to determine whether the person is [an SVP]" is mandatory.

The Missouri Supreme Court recently addressed a similar question in *In re Care & Treatment of Donaldson*, 214 S.W.3d 331 (Mo. banc 2007). In *Donaldson*, the attorney general filed a petition to determine whether Timothy Donaldson was an SVP. *Id.* at 332. Trial was scheduled, but after potential jurors were questioned, an insufficient number of jurors remained and the court declared a mistrial. *Id.* The court did not try the case within ninety days after the mistrial, and Donaldson filed a motion to dismiss for failure to comply with section 632.495,[8] which provides that "[a]ny subsequent trial following a mistrial shall be held within ninety days of the previous trial, unless such subsequent trial is continued as provided in section 632.492." Section 632.492 provides that the trial may be continued "upon the request of either party and a showing of good cause, or by the court on its own motion in the due administration of justice, and when the respondent will not be substantially prejudiced." The Supreme Court determined that the lower court was required only to continue the case in the due administration of justice and to make sure the respondent would not be substantially prejudiced by such continuance. *Donaldson*, 214 S.W.3d at 333. Because the lower court had complied with this requirement, it had not committed any error. *Id.*

In our case, we are dealing specifically with section 632.492, which provides that the court may continue the trial "in the due administration of justice" as long as "the respondent will not be substantially prejudiced." There is no allegation here that Barlow was prejudiced by the delay. It was Barlow's defense efforts that precipitated the delay. After the initial evaluation was completed, Barlow filed a motion seeking an independent evaluation "prior

---

**8.** Section 632.495 has since been amended, effective June 5, 2006. Our references to section 632.495 refer to the previous version of the statute.

to further proceedings." The court granted the request. No report of the independent evaluation was ever filed, and Barlow did not inform the court that one would not be filed. Barlow also filed summary judgment motions and a motion for dismissal based on the "concurrent jurisdiction" argument. *See Barlow,* 114 S.W.3d at 335. Although Barlow was properly acting in his own defense, the court was acting in the due administration of justice by delaying the trial in order to handle his motions. We find no error in the delays in getting the case to trial. Barlow's third point is denied.

### Hung Jury

■ Barlow's final point contends that section 632.495 mandates that once the trial resulted in a hung jury, the court was required to order Barlow's release. This contention was not preserved for appeal, but we will exercise our discretion to address it *ex gratia.*

This is an issue of statutory interpretation, which we review *de novo. Wiley,* 80 S.W.3d at 511–12. Section 632.495 states that the court or jury shall determine beyond a reasonable doubt whether a person is an SVP. If such determination is to be made by jury, the jury verdict must be unanimous. Section 632.495. Barlow argues that the following language in Section 632.495 indicates that if the jury results in a hung jury, the person must be immediately released: "If the court or jury is not satisfied beyond a reasonable doubt that the person is [an SVP], the court shall direct the person's release." *Id.* Barlow argues that in his case the jury was not satisfied beyond a reasonable doubt that he was an SVP, because it could not come to a unanimous verdict that he was an SVP. Therefore, Barlow argues, the court should have released him.

When statutory language is clear, we must give effect to the language as written.

ten. *Boggs ex. rel Boggs v. Lay,* 164 S.W.3d 4, 23 (Mo.App.2005). We are without authority to read into a statute legislative intent contrary to that made evident in the plain language of the statute. *Id.* The court must regard the statute as meaning what it says. *Id.*

■ A hung jury is a form of mistrial. *See State v. Grim,* 854 S.W.2d 403, 411 n. 6 (Mo. banc 1993); *State v. Dexter,* 954 S.W.2d 332, 334 (Mo. banc 1997); *State v. Perry,* 643 S.W.2d 58, 61 (Mo.App.1982). It is well settled that nothing bars retrial after a mistrial that resulted from a hung jury unless the court abused its discretion in declaring the mistrial. *Perry,* 643 S.W.2d at 61. Here, there is no implication or evidence to suggest that the court abused its discretion in declaring a mistrial after the jury was unable to reach a verdict.

The statutory language in question treats the judge or jury as a fact-finding unit and speaks of the jury as though it were a singular entity. The language "if the court or jury is not satisfied" does not contemplate a hung jury, but instead contemplates a verdict of some kind, either for the state or for the defendant. We know this because the statute goes on to say that "[a]ny subsequent trial *following a mistrial* shall be held within ninety days of the previous trial." The legislature clearly contemplated retrial after declaration of a mistrial. Barlow's last point is denied.

### Conclusion

For all of the foregoing reasons, the judgment is affirmed.

SPINDEN and BRECKENRIDGE, JJ., concur.