

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FIVE

| | |
|---|---|
| IN THE MATTER OF THE CARE AND TREATMENT OF WILLIAM DOYLE,<br><br>Appellant. | ) ED100202<br>)<br>) Appeal from the Circuit Court<br>) of St. Louis County<br>) 11SL-PR01682<br>)<br>)<br>) Honorable Carolyn C. Whittington<br>)<br>) Filed: April 29, 2014 |

## Introduction

William Doyle (Appellant) appeals the judgment of the trial court committing him to secure confinement in the custody of the Department of Mental Health (Department) after a jury found that Appellant was a sexually violent predator (SVP) under Section 632.480(5).[1] We affirm.

## Background

Appellant pled guilty to statutory rape in the first degree on May 25, 2001, and was set to be released from prison on June 27, 2011. On June 17, 2011, the State filed a petition to have Appellant committed to the Department as an SVP. After a hearing, the probate court determined there was probable cause to believe Appellant was an SVP

---

[1] All statutory references are to RSMo. (Supp. 2013) unless otherwise indicated.

within the meaning of Section 632.480(5). A jury trial took place in March of 2013. The evidence at trial, in the light most favorable to the verdict, was the following.

Appellant was born in 1974. His parents divorced when he was young, and his mother's boyfriend sexually abused him. He also had sexual interactions with babysitters when he was five years old.

In 1991, Appellant sexually molested his half-sister, Betty, who was six years old at the time. An older sister came into the room and saw Appellant naked from the waist down and Betty with very little clothing. During an investigation following this, Betty reported several incidents of Appellant molesting her, which included him touching her, lying on top of her, asking her to touch his penis, touching her anus with his penis, and ejaculating. The day Appellant's older sister walked in and saw them, Appellant continued molesting Betty after she left. He would promise Betty that he would to take her to McDonald's if she touched his penis, and he threatened to beat her up if she told anyone.

Appellant pled guilty to sexual abuse in the first degree for the molestation of Betty. He received a suspended imposition of sentence, five years of probation, and he was required to participate in sex offender treatment. He participated to some extent in this treatment and had probation extended because of an unrelated arrest. While on probation, he was 18 years old and was living with a 15-year-old girl whom he impregnated and had a child. Appellant completed probation in June 1997.

Appellant was investigated again in 2000 for allegations of sexual abuse against an eight-year-old girl, Paige. Appellant was living with his girlfriend at the time, and his girlfriend was Paige's babysitter. One day, Paige's mother came to drop her off with

Appellant's girlfriend, who was not home. Paige did not want to go in the house with only Appellant home, and she eventually admitted to her mother that it was because Appellant had touched her vaginal area. In a forensic interview conducted by the Division of Family Services (DFS) in October of 2000, Paige reported that Appellant had touched her several times since she was six years old. On October 27, 2000, Appellant denied any sexual contact with Paige in his interview with DFS. DFS eventually made a finding of probable cause during its investigation. The State of Missouri obtained an arrest warrant in 2001 regarding the incidents with Paige.

However, at that time Appellant was in prison for a separate sexual abuse case. In November of 2000, while the investigation regarding Paige was still open, Appellant was found to have engaged in sexual activity with another child, Audrey, who was 13 years old. Audrey was Appellant's father's wife's niece, and they met at a family gathering. Appellant was 26 years old at the time. They had sexual intercourse twice that day and continued having sexual intercourse several times over the next month. Audrey's mother discovered their sexual activity by listening to a telephone conversation Audrey had with Appellant. Appellant was convicted of statutory rape in both St. Louis County and Jefferson County for having sexual intercourse with Audrey. He was sentenced to 10 years in St. Louis County and 12 in Jefferson County, to be served concurrently in the Missouri Department of Corrections.

Appellant was in prison from 2001 through 2009, during which he completed the Missouri Sex Offender Program (MOSOP). He received one sexual misconduct violation during that time for groping the breast of a female visitor and allowing her to touch his groin. Appellant was released on parole in 2009. He committed several rule violations

3

and eventually his parole was revoked and he returned to prison. His rule violations included a delay in beginning sex offender treatment, failing to attend two assigned therapy sessions, having cell phone numbers and email addresses that he did not disclose to his parole agent, and having unauthorized social media accounts. Appellant was also evasive in his answers during treatment while on parole, and he had several relationships with women that he did not disclose during that time.

Four experts testified regarding Appellant's status as an SVP. Dr. Kimberly Weitl, a clinical psychologist employed by the State of Missouri in MOSOP, had screened Appellant's records in 2009 when he was released on parole. At that time, she considered Appellant to have a sexual disorder and a high risk of reoffending. However, she did not find a mental abnormality at the time, and Appellant was released on parole because he had completed MOSOP, which typically mitigates the risk of reoffending.

Dr. Weitl had originally diagnosed Appellant with paraphilia, a general category of deviant sexual behavior. However, she changed this diagnosis to pedophilia when she learned that Appellant's first victim was younger than he had reported and the abuse went on for a longer period of time.[2] She found that he had not integrated the principles he had learned in treatment. In addition to independently considering Appellant's risk factors including his specific behavior toward the victims and his actions going through treatment, Dr. Weitl used two diagnostic tools in evaluating Appellant the second time, the Static-99 and the Minnesota Sex Offender Screening Tool Revised (MnSOST). She scored a three or four on the Static-99, and a 14 on the MnSOST; the 14 MnSOST score is in a subcategory of high risk for reoffending. Dr. Weitl testified she believed

---

[2] Pedophilia requires a finding that the abuse went on for at least six months.

4

Appellant was more likely than not to reengage in predatory acts of sexual violence if not confined to a secure facility.

The State also sought a second opinion from Dr. Angeline Stanislaus, a forensic psychiatrist. Dr. Stanislaus reviewed all reports and records related to Appellant, but Appellant did not consent to an interview with her. Dr. Stanislaus diagnosed Appellant with pedophilia. She based this in part on the facts showing he molested three children each over a period of time, and she found that several of his actions related to the abuse of each victim showed he has serious difficulty controlling his behavior and sexual urges. Dr. Stanislaus also assessed Appellant's risk for reoffending, which she based in part on actuarial tools. She used the Static-99, as well as its revised version, the Static-99R. She gave Appellant a score of three on both instruments, which is in the moderate low risk category. Dr. Stanislaus also evaluated Appellant's dynamic risk factors, which are individualized factors that can be identified in particular offenders. She found several risk factors present in Appellant, including deviate sexual interest, sexual preference for children, emotional identification with children, offense-supportive attitude, sexual preoccupation, and impulsivity. She concluded in this light that he was more likely than not to reoffend if not confined to a secure facility.

Appellant called Dr. Jeffrey Kline to testify, a forensic psychologist employed by the Department, who also evaluated Appellant. Dr. Kline reviewed Appellant's records but did not interview Appellant. He concluded Appellant did not have a mental abnormality as required under the definition of an SVP. Dr. Kline opined that Appellant had adult antisocial behavior. He said Appellant may have an antisocial personality disorder, but there was not enough information to prove it. Dr. Kline also considered the

5

diagnosis of pedophilia, but he concluded there was not enough evidence to confirm Appellant was in fact sexually attracted to children, or that his behavior was driven by sexual urges or fantasies toward children. Dr. Kline testified that there are many reasons a person can engage in sexual behavior with children, and they are not necessarily due to pedophilia. Dr. Kline gave Appellant a score of four on the Static-99R, which is in the moderately high category of risk. Dr. Kline concluded that Appellant did not suffer from a mental abnormality that would make it difficult for him to control his behavior. Also, Dr. Kline saw no evidence that he reoffended while on parole, though he acknowledged the presence of some risk factors such as unstable employment history. Dr. Kline concluded he did not believe that Appellant was more likely than not to reoffend if not confined to a secure facility.

Dr. Luis Rosell, a clinical and forensic psychologist, was the final expert who testified on Appellant's behalf concerning his status as an SVP. He reviewed the records of Drs. Weitl, Stanislaus, and Kline. He also met with Appellant. Dr. Rosell found it noteworthy that when Appellant was released on parole, the State did not seek to have him committed as an SVP, and Appellant's parole was not revoked because of any evidence that he was interested in prepubescent children. Dr. Rosell also did not find that Appellant had pedophilia, and he agreed with Dr. Kline that there are many other reasons why people may commit sex offenses against children. Dr. Rosell diagnosed Appellant with adult antisocial behavior. Dr. Rosell also used the Static-99R to assess Appellant's risk of reoffending. He gave Appellant a score of three if he had lived with a lover for over two years, and a four if that was not true. He concluded that Appellant did not

6

suffer from a mental abnormality under the applicable definition, and he did not believe that Appellant was more likely than not to reoffend if not held in a secure facility.

Appellant testified that he had learned from his treatment in MOSOP and therapy while he was on parole. He reflected on the past abuse he had endured, and he learned about empathy and the effects of what he had done to his victims. He realized he had rationalized the abuse against Betty because her father was the one who had sexually abused him. He also believed the things he had done were not wrong at the time, but he knows they were wrong now. He testified regarding strategies he learned to stop himself before reoffending, and that he did not want to cause anyone more pain.

The jury found that Appellant was an SVP, and the probate court issued its judgment committing him to the custody of the Department for control, care, and treatment, until such time as Appellant's mental abnormality had so changed that he was safe to be at large. This appeal follows.

## Discussion

Appellant raises two points on appeal. In Point I, he argues that the probate court erred in allowing the testimony of Dr. Stanislaus, because Section 632.489.4 allows only the respondent in an SVP commitment proceeding to privately retain experts, not the State of Missouri (State). In Point II, Appellant argues that the evidence was insufficient for the jury to find by clear and convincing evidence that Appellant is an SVP. We discuss each in turn.

7

Standard of Review

We review a probate court's decision to admit evidence for abuse of discretion. Elliot v. State, 215 S.W.3d 88, 92 (Mo. banc 2007). An abuse of discretion occurs when the ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. Id. A court can abuse its discretion through the application of incorrect legal principles, and when the issue is a purely legal one, our review is *de novo*. State v. Taylor, 298 S.W.3d 482, 492 (Mo. banc 2009).

Analysis

Appellant argues the probate court abused its discretion in admitting the testimony of Dr. Stanislaus, because it incorrectly applied Section 632.489.4. Specifically, Appellant argues that because the statute explicitly grants the respondent in an SVP commitment proceeding the right to obtain subsequent examinations by his or her expert of choice, but not the State; the State had no authority to retain a private expert, and the court should have excluded any opinion from such an expert. We disagree.

"The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to the intent if possible, and to consider the words in their plain and ordinary meaning." Holtcamp v. State, 259 S.W.3d 537, 539 (Mo. banc 2008). Section 632.489.4 states, in relevant part, the following:

> The court shall direct the director of the department of mental health to have the person examined by a psychiatrist or psychologist . . . who is not a member of the multidisciplinary team that previously reviewed the person's records. In addition, such person may be examined by a consenting psychiatrist or psychologist of the person's choice at the

> person's own expense. . . . One examination shall be provided at no charge by the department. *All costs of any subsequent evaluations shall be assessed to the party requesting the evaluation.*

(emphasis added).

Appellant argues that because the only explicit right to a privately retained expert is granted to the respondent in an SVP proceeding, the State may not hire a private expert. In contrast, the State points to the emphasized language above, arguing that the statute assumes that either party may hire an additional expert and therefore states that the party requesting the additional opinion must bear its cost. Appellant responds that this language is superfluous in light of the explicit right given only to respondents.

We presume that the legislature intended every provision of a statute to have effect and that the legislature did not insert superfluous or meaningless language. State ex rel. Unnerstall v. Berkmeyer, 298 S.W.3d 513, 519 (Mo. banc 2009) (quoting Hyde Park Hous. P'ship v. Dir. of Revenue, 850 S.W.2d 82, 84 (Mo. banc 1993)). Thus, the final sentence of Section 632.489.4, stating that whichever party orders an examination must bear its cost, must be given effect. If either party must pay for an evaluation it requests, it must be true that either party has the right to request such an evaluation. To read the statute otherwise would render this sentence meaningless and the statute inconsistent. Thus, this final sentence of Section 632.489.4 indicates an implicit right of either party to hire a private expert at its own expense.

The Southern District of the Missouri Court of Appeals agreed in In the Matter of the Care and Treatment of Spencer, 103 S.W.3d 407, 419 (Mo. App. S.D. 2003) (acknowledging that though plain language of Section 632.489.4 does not explicitly allow State to hire private expert, "such a right is implicit in the [final sentence] of the

9

statute"). Additionally, while not addressing this issue squarely, other Missouri courts have noted that the State has hired an additional privately retained expert in commitment proceedings under Section 632.489.4 to evaluate whether a respondent is an SVP. See Tyson v. State, 249 S.W.3d 849, 853 n.7 (Mo. banc 2008) (determining State's evidence at SVP trial is not limited to only evidence presented at probable cause hearing because statute contemplates additional psychiatric or psychological evaluation; noting in case at bar, State had respondent evaluated by two psychiatrists pursuant to Section 632.489.4); Care & Treatment of Barlow v. State, 250 S.W.3d 725, 732 (Mo. App. W.D. 2008) (noting State hired additional expert, finding "no authority for the proposition that it is wrong for the State to engage another expert to give an opinion consistent with the result it is seeking").

While Appellant points to other statutes explicitly granting the State the right to hire private experts, arguing these show that the State's right must also be explicit here to be actual, these sections are not sufficiently similar to validate Appellant's arguments.[3] The plain language of Section 632.489.4 infers that the State may retain a private expert to offer an opinion at its own expense. At the same time, the implicit right of the State to hire privately retained experts here in order to have an expert opinion consistent with the

---

[3] Appellant points to Section 632.498.5(2) (annual examination of persons committed as SVPs) and Section 552.020 (evaluation of criminal defendants for capacity to stand trial). Neither of these contains the same structure as the statute at issue here, but both are consistent with the proposition that either party may request a private evaluation and must bear the expense of such evaluation if it occurs. Similarly, Appellant's reliance on Fogle v. Koster, 382 S.W.3d 139, 145 (Mo. App. W.D. 2012), is misplaced. The statute there, Section 632.495 (commitment to Department upon SVP finding) is not similarly written, in that it is not initially silent on the court's authority to grant special conditions and later assumes the court had such authority; rather, the plain language of that statute makes clear that the court loses authority over the respondent upon an SVP finding and can only turn the person over to the Department. The statute's silence on the right of the court to impose conditions, as well as the explicit right granted elsewhere in the context of conditional release, is indicative of legislative intent. Fogle, 382 S.W.3d at 145. In contrast here, the final sentence of Section 632.489.4 assumes the State's right to hire experts by assigning the cost for such experts to the State, even though the statute is initially silent regarding the State. This sentence is therefore indicative of the legislature's intent that both parties may hire private experts.

State's desired result should be exercised in light of the State's duty "to be reasonable and fair, not deceitful or underhanded." Barlow, 250 S.W.3d at 732.[4]

Thus, in light of the statutory language, the probate court did not abuse its discretion in allowing the testimony of Dr. Stanislaus. Point denied.

## Point II

Appellant argues that the evidence at trial was insufficient to prove by clear and convincing evidence that Appellant is an SVP. We disagree.

## Standard of Review

We review challenges to the sufficiency of the evidence in commitment proceedings to determine whether there was sufficient evidence from which a reasonable juror could have found each necessary element of an SVP finding by clear and convincing evidence. In re A.B., 334 S.W.3d 746, 752 (Mo. App. E.D. 2011). We do not reweigh the evidence, rather we determine only whether the judgment is supported by sufficient evidence. Id. Thus, we view the evidence in the light most favorable to the judgment, accepting as true evidence and reasonable inferences in favor of the judgment and disregarding contrary evidence and inferences. Id.

## Analysis

An SVP is defined as "any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence and who: . . . [h]as pled guilty or been found guilty . . . of a sexually violent offense." Section

---

[4] This begs the question of the appropriate limits of this right in the SVP context. At present, the State's own duty of reasonableness is the only apparent limit on the State's right to hire private experts. While we are not confronted here with a case where the State has scoured the country looking for that one expert that will give an opinion consistent with the State's position, such a practice is a possible outcome under the letter of the statute. At the same time, this appears to be inconsistent with the State's duty to be reasonable and fair, and the State should temper its exercise of this statutory right accordingly.

11

632.480(5)(a). In addition to the State presenting evidence of Appellant's prior conviction, the jury had to find two elements by clear and convincing evidence: (1) that Appellant suffers from a mental abnormality, and (2) that he is more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility. A.B., 334 S.W.3d at 752. Appellant argues that neither was supported by the evidence at trial.

### 1. Mental Abnormality

Appellant argues that the testimonies of Drs. Stanislaus and Weitl failed to prove that Appellant suffered from a mental abnormality. Specifically, Appellant argues that to diagnose Appellant with pedophilia, the experts had to find evidence that Appellant had sexual urges and fantasies toward children, whereas the State's experts relied only on Appellant's behavior and the ages of the victims.

Both doctors testified that a person could meet the diagnostic criteria for pedophilia if he or she engaged in sexual behaviors with a prepubescent child for a period of six months or more. Both Drs. Stanislaus and Weitl found evidence that Appellant engaged in this type of behavior with Betty and Audrey.[5] Drs. Kline and Rosell both hesitated to diagnose Appellant based on evidence of this behavior alone, because they believed such behavior could be exhibited for reasons other than deviant sexual urges and fantasies regarding children, including due to the past abuse Appellant himself had endured. They found no evidence Appellant was actually attracted to young children.

The jury was free to give greater weight to the testimonies of Dr. Stanislaus and Dr. Weitl, and we may not second-guess their determination. Barlow, 250 S.W.3d at

---

[5] There was some disagreement about whether Audrey qualified as prepubescent. While the diagnostic criteria states that age 13 or younger qualifies, Dr. Weitl testified that even if she had not considered Audrey, Appellant's abuse of his six-year-old half-sister for two years alone qualified him under the diagnostic criteria.

733. All four experts applied the same diagnostic criteria; they simply disagreed on the conclusion. The opinions of Drs. Stanislaus and Weitl contained sufficient evidence from which the jury could find clear and convincing proof that Appellant suffered from the mental abnormality of pedophilia.

### 2. More Likely Than Not to Reoffend

Finally, Appellant argues that there was insufficient evidence from which the jury could find that he was more likely than not to reoffend if not confined to a secure facility, because the experts expressing such an opinion relied on terms not defined by any accepted diagnostic manual and failed to account for the fact that Appellant had only adult consensual sex while on parole and did not reoffend. Appellant argues the verdict, therefore, is based on speculation.

Dr. Stanislaus considered several aspects of Appellant's behavior in concluding that Appellant had serious difficulty controlling his behavior, including, that he continued molesting Betty immediately after being discovered, he reoffended while on probation, and he committed statutory rape against Audrey while the State's investigation with Paige was open. Dr. Stanislaus found that although he did not reoffend against children, Appellant's activity while he was on parole demonstrated a preoccupation with sex that increased his risk of reoffending. Dr. Stanislaus also used accepted actuarial tools and dynamic risk factors to come to her conclusion that Appellant was more likely than not to reoffend if not confined to a secure facility.

Additionally, Dr. Weitl found that Appellant had not integrated what he had learned in treatment. She found it significant that what had made him stop abusing each known victim was intervention by a third party, rather than him stopping of his own

accord. She also believed that while he did not reoffend while on parole, the fact that he was not forthcoming in therapy about his sexual behavior was a high risk factor. Dr. Weitl also utilized accepted actuarial tools, and in light of all the evidence she considered, she concluded Appellant was more likely than not to reoffend if not confined to a secure facility.

While Drs. Kline and Rosell offered contrary opinions, it was for the jury to determine the weight to give each expert's testimony. Barlow, 250 S.W.3d at 733. The opinions of Drs. Stanislaus and Weitl were based on the types of data reasonably relied on by experts in their field and did not constitute speculation. See In re A.B., 334 S.W.3d 746, 753 (Mo. App. E.D. 2011).

Because the record contained sufficient evidence for the jury to find by clear and convincing evidence that Appellant was more likely than not to reoffend if not confined to a secure facility, we cannot disturb the jury's finding in this respect. Point denied.

## Conclusion

The trial court did not abuse its discretion in admitting the testimony of Dr. Stanislaus, as Section 632.489.4 implicitly grants the State the right to privately retain an expert medical opinion. The evidence was sufficient for the jury to find each of the necessary elements by clear and convincing evidence that Appellant is an SVP. We affirm.

_____
Gary M. Gaertner, Jr., J.

Robert M. Clayton III, C. J., concurs.
Gary Dial, S.J., concurs.

14