**In the Matter of the Care and Treatment of A.B.,
Appellant.**

**No. ED 93812.**

Missouri Court of Appeals,
Eastern District,
Division Three.

March 22, 2011.

Emmett D. Queener, Columbia, MO, for Appellant.

Alana M. Barragan–Scott, Jayne T. Woods, Jefferson City, MO, for Respondent.

Before SHERRI B. SULLIVAN, P.J., CLIFFORD H. AHRENS, J. and LAWRENCE E. MOONEY, J.

## SHERRI B. SULLIVAN, P.J.

### Introduction

A.B. (Appellant) appeals from the trial court's judgment entered pursuant to a jury verdict committing him to secure confinement in the custody of the Missouri Department of Mental Health (DMH) as a sexually violent predator (SVP). We affirm.

### Factual and Procedural Background

### Appellant's Criminal Behavior

Viewed in the light most favorable to the verdict, the following facts were adduced at trial.

Appellant has six known molestation victims: E.D., Appellant's niece, at 4–5 years old; C.B., Appellant's niece and sister to E.D., from when she was a young child until age 11–12, and again at age 16; M.D., Appellant's sister-in-law, at 15–16; M.R., Appellant's niece and M.D.'s daughter, at age 15; J.C., Appellant's granddaughter, at age 8–9; and K.R., Appellant's great-niece and M.D.'s granddaughter, at age 6.

### Testimony of Victims

### E.D. (by deposition)

E.D. recalled that when she was 4 or 5 years old, she was sleeping in her bed when Appellant came into her room, took her from her bed into his room, where he laid her on the bed, put her hand on his "private area," and called her by his wife's name. E.D. never told anyone until around the time of this case because she was ashamed, and was trying to block it out.

### C.B. (by deposition)

At the time of the deposition, C.B. was 60 years old. C.B. stated that when she was a young child, her exact age she cannot recall, she and Appellant were riding in the backseat of a car which her father was driving. C.B. was sleeping in Appellant's lap when she awoke to him fondling her vaginal area *while he was having a conversation with her father.* C.B. said that this same sort of behavior on the part of Appellant, his fondling her vaginal area, usually waking her from sleep, went on for a period of time until she was 11 or 12. Usually no one else but the two of them were present when Appellant molested her, except for one other occasion she remembered, when she was watching television at Appellant's house, again sitting in his lap, and Appellant began fondling her. Appellant's wife was home at the time, cleaning, when she walked into the room, saw what Appellant was doing, and said, "What do you think you are doing?"

C.B. stated that when she was about 10, 11 or 12 years old, she and her three sisters had spent the night at Appellant's house when Appellant came into her room to wake her up for school while fondling her vagina. At that point she mustered the courage to confront Appellant about the touching because she became concerned that he would try to do it to her three sisters as well. She told him that if he touched her sisters, she would kill him. Appellant laughed and told her she was not going to say anything. She then told him that if he touched her sisters, she would "show" him.

After this exchange, Appellant stopped molesting C.B. until she was 15 or 16,

when Appellant asked her if she could move into his family's house and help his wife take care of their five children at night. C.B. agreed, she said, because she loved her aunt and cousins and felt that Appellant was no longer a threat to her after she had confronted him. Appellant built a special bedroom in the garage for C.B., which surprised her because she assumed she would be sharing a room with someone, because Appellant, his wife, their five children and several other people were staying at the house. One night, recounted C.B., Appellant came into her bedroom as she pretended to be asleep. Appellant began feeling her legs and moving up to her stomach. C.B. opened her eyes and asked him what he was doing. Then C.B. heard Appellant's wife yelling, "Adrian, what are you doing?" C.B. told Appellant that he had better get out of there, and yelled, "He's not doing nothing" to Appellant's wife. Appellant then left her bedroom.

C.B. never told anyone about the molestation except at age 12 or 13, she told her uncle B.B., who is Appellant's brother. C.B. recounted that nothing happened as a result of her confiding in her uncle, and no one said anything, so she decided to keep quiet.

### M.D. (live testimony)

When Appellant's sister-in-law M.D.[1] was approximately 15 ½–16 years old, Appellant wanted to teach her how to operate a car with manual transmission. While M.D. was practicing, Appellant tried to put his hand up her skirt. M.D. told Appellant she wanted to go home, and never went driving with him again. Another time M.D. spent the night at her sister and Appellant's house. M.D. was awakened in the middle of the night when Appellant put his hands on her and tried to get on top of

her. M.D. immediately left the house, and later, Appellant told M.D. that no one would believe her if she told them. Appellant also said to M.D. that if she told her mother what he had done, M.D.'s mother would die. At this time, M.D.'s father had just died. This was why M.D. did not tell anyone about what Appellant had done to her, until recently, when Appellant would not plead guilty to molesting M.D.'s granddaughter and forced M.D.'s granddaughter to have to testify at trial. M.D. testified that at the time Appellant molested her, in the 1960s, it was kept in the closet.

Appellant later admitted sodomizing M.D. on at least ten occasions by touching her breasts and rubbing his penis on her buttocks until he ejaculated.

### J.C. (live testimony)

In 1991, J.C., who was about 8 or 9 years old, and her younger sister, who was 5 or 6, went over to Appellant's house for the weekend to see their father, who is Appellant's son and lived with Appellant. That weekend, Appellant made J.C. and her younger sister watch pornographic movies. The girls' father was there but made them turn their heads when oral or sexual intercourse came onto the screen. The 1991 police reports indicate that J.C. told the police that after she had fallen asleep on the couch, she awoke in Appellant's bedroom with Appellant on top of her, touching her. She recounted that Appellant put his finger and thumb into her "private area" and pushed his "private area" against hers very hard. Appellant also put a hand down J.C.'s pants and fondled her vaginal area. J.C. stated that she screamed, and her little sister came into the bedroom and began screaming as well. Appellant took J.C.'s sister out of the room and locked the bedroom door;

---

1. M.D. is the sister of J.B., Appellant's wife.

then climbed back on top of J.C., put his hands in her pants, and then pushed really hard on her "private area." He also put his hand on her buttocks, and his hand inside her pants. He did this until he ejaculated. J.C. told her mother what happened.

### K.R. (testimony from police reports recounted by Dr. Hoberman)

Approximately 10 years later, in 2001, when K.R., who is M.R.'s daughter, M.D.'s granddaughter, and Appellant's great-niece, turned 6 years old, Appellant suggested that the family have a birthday party for her at Appellant's house. During the party, K.R.'s aunt saw Appellant and K.R. in a bedroom and heard Appellant offer K.R. five dollars. The aunt told K.R.'s mother, who investigated and discovered Appellant lying on the bed with K.R. with his hand down the front of her pants and rolling over on top of her. K.R.'s mother grabbed K.R. away from Appellant and asked her what had happened. K.R. said that Appellant had his finger on her vaginal area.

### M.R. (via testimony of Dr. Harry Hoberman from report)

At the time that K.R. was molested by Appellant, M.D.'s daughter, M.R., also made statements that Appellant had molested her when she was 15 years old.

### Appellant's Incarceration and Treatment

As a result of the 1991 incident and J.C.'s telling her mother about it, Appellant was charged with three counts of first-degree sexual abuse. Appellant, in a deal with the prosecutor, pled guilty to one misdemeanor count of attempted first-degree sexual abuse, was placed on two years' probation, and was required to complete outpatient sex offender treatment. Despite the fact that Appellant refused to admit his sexual offenses against J.C. during treatment, William Brown (Brown), Appellant's therapist, determined that Appellant successfully completed the program and that he was a very low risk re-offender.

As a result of the 2001 incident against K.R., Appellant was convicted on June 2, 2002 of first-degree child molestation and sentenced on April 30, 2003 to five years' imprisonment. For his 2001 offense, while in prison, Appellant participated in the Missouri Sexual Offenders Program (MOSOP). MOSOP consists of two phases: (1) a psycho-educational course and (2) group therapy. When Appellant first began MOSOP, he repeatedly denied and minimized his offenses, and he was temporarily suspended before being placed on the intellectually impaired track, where his performance improved. Before Appellant's scheduled release, Dr. Kimberly Weitl (Dr. Weitl) conducted an end-of-confinement report, in which she diagnosed Appellant with pedophilia and opined that he was more likely than not to re-offend sexually if not confined. Thus, she determined that Appellant met the definition of an SVP.

Both the multidisciplinary team and the prosecutor's review committee agreed, and the Attorney General's Office filed a petition to have Appellant civilly committed as an SVP. The probate court found probable cause to believe that Appellant was an SVP, and ordered the DMH to evaluate Appellant and determine if he met the definition of an SVP.

### Evaluation of Appellant as an SVP

### Dr. Scott

The DMH had Dr. Richard Scott (Dr. Scott) conduct the evaluation of whether Appellant met the criteria of an SVP. Dr. Scott diagnosed Appellant with pedophilia

and opined that this diagnosis constituted a mental abnormality under the SVP statutes. Dr. Scott employed both the STATIC–99 and the RRASOR actuarial tools to assess Appellant's risk of re-offending. Appellant's scores placed him in the low to moderate-low risk categories of re-offending. Dr. Scott concluded that Appellant was *not* more likely than not to commit predatory acts of sexual violence if not confined, and thus according to him Appellant did *not* meet the definition of an SVP.

### Dr. Hoberman

The State asked Dr. Hoberman to conduct an evaluation. Like Dr. Scott, Dr. Hoberman diagnosed Appellant with pedophilia and determined that the diagnosis constituted a mental abnormality under the SVP statutes. But unlike Dr. Scott, Dr. Hoberman did not believe that actuarial tools such as the STATIC–99 were appropriate for use on an older offender such as Appellant, who was 76 years old at the time of trial. Instead, Dr. Hoberman used the SVR–20, which is an instrument developed by Canadian and American psychologists as a means of risk assessment and risk management for sex offenders. Dr. Hoberman testified that the SVR–20 was reasonably relied upon by professionals in the field in SVP evaluations and that it had been subjected to a number of studies. The SVR–20 examines a list of twenty empirically tested factors known to affect probabilities that a sex offender will re-offend. It was developed to be a more offender-specific method of determining risk. Based upon the results of the SVR–20, coupled with the base rate for re-offending amongst sex offenders with child victims, Dr. Hoberman opined that Appellant *is* more likely than not to re-offend if not confined, and as a result, it was his professional opinion that Appellant *is* an SVP.

### Dr. Jason Neufeld

Appellant had Dr. Jason Neufeld (Dr. Neufeld) evaluate him to determine his SVP status. Dr. Neufeld also diagnosed Appellant with pedophilia, but determined that the diagnosis did not constitute a mental abnormality because he did not believe that Appellant had serious difficulty controlling his behavior as a consequence of the pedophilia.

Despite not finding a mental abnormality, which precludes an SVP finding, Dr. Neufeld went on to engage in a re-offending risk assessment, using the STATIC–99. Dr. Neufeld found that Appellant had a moderate to low risk of re-offending. Dr. Neufeld did not look beyond the STATIC–99 score, and because it was associated with an approximate 5.7% risk of re-offending, he determined that Appellant is *not* more likely than not to re-offend if not confined, and thus concluded that Appellant is *not* an SVP.

The jury heard the above recounted experiences of Appellant's victims C.B. (by deposition), E.D. (by deposition), M.D. (live), J.C. (live), K.R. and M.R. (police report/expert witness); the testimony of Stephen Walker (Walker), who was Appellant's MOSOP therapist; and the professional opinions of Drs. Scott, Hoberman and Neufeld as to whether or not Appellant fit the criteria of an SVP, and rendered its verdict that Appellant is an SVP. The probate court accordingly ordered Appellant committed to the custody of the DMH for care, control and treatment. This appeal follows.

### Point on Appeal

In his point on appeal, Appellant claims that the trial court erred in committing him to indefinite secure confinement in the custody of the DMH as an SVP because the evidence presented at trial was insuffi-

cient to clearly and convincingly prove to the jury that Appellant is more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility. Appellant maintains that the jury could only have reached that conclusion by relying on emotion and speculation.

### Standard of Review

The burden of proof in civil commitment proceedings is clear and convincing evidence. *In the Matter of the Care and Treatment of Van Orden*, 271 S.W.3d 579, 586 (Mo.banc 2008). Appellate review in an SVP case is limited to a determination of whether there was sufficient evidence admitted from which a reasonable jury could have found each necessary element by clear and convincing evidence. *In the Matter of the Care and Treatment of Barlow*, 250 S.W.3d 725, 733 (Mo.App. W.D.2008). The appellate court does not reweigh the evidence but determines only whether the judgment was supported by sufficient evidence. *Id.* Matters of credibility and weight of testimony are for the jury to determine. *Id.* For that reason, the evidence is viewed in the light most favorable to the judgment, accepting as true all evidence and reasonable inferences favorable to the judgment and disregarding all contrary evidence and inferences. *Id.* A judgment will be reversed on insufficiency of the evidence only if there is a complete absence of probative facts supporting the judgment. *Id.*, *see also In the Matter of the Care and Treatment of Dunivan*, 247 S.W.3d 77, 78 (Mo.App. S.D. 2008).

### Discussion

"The Missouri legislature created a mechanism to civilly commit sexually violent predators; i.e., 'any person who suffers from a mental abnormality [that] makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility....' " *Holtcamp v. State*, 259 S.W.3d 537, 538–39 (Mo.banc 2008), quoting Section 632.480(5)(a).[2] Thus for an offender who has pled guilty to be committed, the State must satisfy a two-prong test: (1) the offender must suffer from a mental abnormality; (2) that makes him more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility. If the Department of Corrections (DOC) or the DMH believes a person in its custody is an SVP, then that agency may forward written notice to the Attorney General and a multidisciplinary team to determine if the subject is an SVP. *Holtcamp*, 259 S.W.3d at 539; Section 632.483. The notice is provided within 360 days prior to the anticipated release from a correctional center of the DOC of a person who has been convicted of a sexually violent offense. *Holtcamp*, 259 S.W.3d at 539; Section 632.483.1(1). The multidisciplinary team is to determine if the person meets the definition of an SVP. *Holtcamp*, 259 S.W.3d at 539; Section 632.483.4. The team's assessment is provided to the Attorney General and to the prosecutors' review committee. *Holtcamp*, 259 S.W.3d at 539; Section 632.483.4. The five-person prosecutors' review committee is appointed by the prosecutors' coordinators training council, and also determines if the person meets the definition of an SVP. *Holtcamp*, 259 S.W.3d at 539; Section 632.483.5. If the prosecutors' review committee determines by majority vote that the person meets the definition of an SVP, the Attorney General may file a petition in the probate division of the circuit court in which the person was convicted alleging that the person is an SVP. *Holtcamp*, 259 S.W.3d at 539; Section 632.486.

---

**2.** All statutory references are to RSMo 2006, unless otherwise indicated.

■ The single issue on appeal is whether or not there was sufficient evidence presented at trial to clearly and convincingly prove that Appellant is more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility. We believe that there was sufficient clear and convincing evidence presented that Appellant will re-offend if not confined.

In his brief, Appellant endorses the opinions of Drs. Scott and Neufeld,[3] both of whom concluded that Appellant is *not* more likely than not to re-offend if not confined.

Appellant criticizes the opinion of and methodology used by Dr. Hoberman, who concluded that Appellant *is* more likely than not to re-offend if not confined. Appellant also argues that the jury could have only reached the same conclusion as Dr. Hoberman by relying on speculation and emotion, because Dr. Hoberman's testimony clearly contradicted the empirical and actuarial data. Appellant adamantly asserts that "[a] meta-analysis of assessment methodologies demonstrates that a pure actuarial approach is the most accurate method of assessing risk, and that an adjusted actuarial approach is the next most accurate." Appellant would like this Court to consider Dr. Hoberman's testimony as nothing more than speculation because he did not use the STATIC–99 test.

■ Generally speaking, for an expert's opinion to be admissible, it must be supported by the record. *McGuire v. Seltsam*, 138 S.W.3d 718, 722 (Mo.banc 2004);

*Care and Treatment of Morgan v. State*, 176 S.W.3d 200, 211 (Mo.App. W.D.2005). "An expert, in rendering an opinion, can rely on facts and data not admitted at trial; however, the proponent must show that such facts and data are 'of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.'" *Morgan*, 176 S.W.3d at 211, quoting Section 490.065.3.

Dr. Hoberman gave a reason why he did not rely on the STATIC–99 test. Dr. Hoberman testified that he did not believe that actuarial tools such as the STATIC–99 were appropriate for use on an older offender such as Appellant, who was 76 years old at the time of trial. Instead, Dr. Hoberman testified that he used the SVR–20, which is an instrument developed by Canadian and American psychologists as a means of risk assessment and risk management for sex offenders. Appellant presents no evidence that the SVR–20 is unreliable or not generally accepted in the scientific community. Dr. Hoberman testified that the SVR–20 was reasonably relied upon by professionals in the field in SVP evaluations and that it had been subjected to a number of studies. He explained how it works, that it examines a list of twenty empirically tested factors known to affect probabilities that a sex offender will re-offend. Dr. Hoberman also elucidated that it was developed to be a more *offender-specific method* of determining risk.

We note that one of the results of the STATIC–99 gave Appellant a low risk of

---

**3.** We note that Dr. Neufeld did not believe that Appellant's status as a pedophile constituted a mental abnormality in the first place, and that Appellant had no serious difficulty controlling his behavior as a consequence of his pedophilia. Therefore, according to Dr. Neufeld, Appellant does not satisfy the first of two criteria he must meet to be deemed an

SVP. Accordingly, we find his opinion on the second prong, as to whether Appellant is more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility, to be irrelevant because he did not find Appellant to have a mental abnormality at all.

re-offending due to his "advanced" age. However, the factual evidence presented at trial demonstrates that in reality Appellant's age of 67 or 68, at the time of his last very bold offense of molesting his own 6–year–old grand-niece during her birthday party in the midst of relatives in his small, self-described "shotgun" style house, does not appear to be slowing him down in terms of his proclivity to act on his predatory sexual impulses. Therefore, we conclude that Dr. Hoberman's decision not to use the STATIC–99 for such reasons, and to use a more offender-specific test, to be quite sound.

There is nothing in the record showing that Dr. Hoberman, in rendering his opinion that Appellant was more likely than not to engage in future predatory acts of sexual violence, was relying on anything other than facts and data "of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable." Therefore, because Dr. Hoberman's opinion was supported by the record, it was sufficient, in conjunction with the evidence of Appellant's past acts of sexual abuse, to create a submissible case on the issue of whether Appellant was more likely than not to engage in future predatory acts of sexual violence. As such, Appellant cannot complain of the admission of Dr. Hoberman's expert testimony or allege that it did not create a submissible case as to the likelihood of Appellant's committing future predatory sexually violent acts.

In the instant case, Dr. Hoberman provided adequate testimony regarding his professional expert opinion that Appellant is an SVP. Appellant merely disagrees with Dr. Hoberman's opinion, and prefers the opinions set forth by Drs. Scott and Neufeld. Although Appellant criticizes the methodology utilized by Dr. Hoberman in coming to his conclusions, his testimony was admissible; his credentials are substantial; and after a review of the record, we find that the evidence which he presented to the jury was clear and convincing.

Also, there was substantial factual history of the frequency and boldness of Appellant's sexual attacks; his premeditation and threats to his victims; the fact that his victims were all related to him and very young; his lackluster participation in therapy; his refusal to admit to his offenses and failure to attempt to rectify his behavior; his lack of sympathy or insight; and the testimony of his victims. The jury determined that the logical conclusion from all of aforementioned evidence is that Appellant cannot control himself, and thus needs to be confined. Point denied.

### Conclusion

The judgment of the probate court is affirmed.

CLIFFORD H. AHRENS and LAWRENCE E. MOONEY, JJ., concur.