In the Matter of the Care and Treatment of Timothy NELSON, a/k/a/ Timothy L. Nelson, a/k/a/ Timothy Levi Nelson, a/k/a/ Tim Nelson, a/k/a/ Timothy R. Nelson, Respondent–Appellant.

No. SD 31354.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 30, 2012.

Erika R. Eliason, Columbia, MO, for appellant.

Chris Koster, Attorney General, and, Timothy A. Blackwell, Assistant Attorney General, Jefferson City, MO, for respondent.

DON E. BURRELL, J.

A jury found Timothy Nelson ("Appellant") to be a sexually violent predator ("SVP"), and he was committed to the custody of the director of the Department of Mental Health "until such time as [Appellant's] mental abnormality has so changed that he is safe to be at large." *See* sections 632.480 and 632.495.[1]

In a single point, Appellant contends: 1) there was insufficient evidence to prove clearly and convincingly that he was a SVP; 2) the verdict was against the weight of the evidence; and 3) "the jury relied on speculation and emotion" generated by correspondence between Appellant and another man and testimony about it from the State's psychologist. For the reasons set forth herein, we reject these claims and affirm the judgment.

### Governing Law

As applicable to this case, a "**sexually violent predator**" is "any person who suffers from a mental abnormality which makes the person more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility" and who also has "pled guilty or been found guilty" of a sexually violent offense. Section 632.480(5)(a). A "**mental abnormality**" is "a congenital or acquired condition affecting the emotional or volitional capacity

which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others[.]" Section 632.480(2). A "**sexually violent offense**" includes "sexual assault[.]" Section 632.480(4).

■ Therefore, the State must prove, by clear and convincing evidence, that the offender at issue: 1) "suffer[s] from a mental abnormality"; and 2) the abnormality "makes him more likely than not to engage in predatory acts of sexual violence if not confined in a secure facility." *In re Care & Treatment of A.B.*, 334 S.W.3d 746, 752 (Mo.App. E.D.2011); section 632.495.[2] The jury's verdict must be unanimous. Section 632.495; *see also In re Care & Treatment of Arnold*, 292 S.W.3d 393, 397 (Mo.App. E.D.2009).

### Facts and Procedural Background

The evidence, as viewed in the light most favorable to the verdict, *see A.B.,* 334 S.W.3d at 752, was as follows. Appellant was thirty years of age at the time of his jury trial in March 2011. The director of the Department of Forensic Services for the Missouri Department of Mental Health, Dr. Steven Mandracchia, a psychologist, performed a court-ordered evaluation of Appellant in September 2010 and testified on behalf of the State. In conducting his evaluation, Dr. Mandracchia reviewed various records. Those records included prison records, police reports, court records, depositions, and prior evaluations of Appellant. Dr. Mandracchia also interviewed Appellant.

1. Unless otherwise stated, all statutory references are to RSMo Cum.Supp.2011.

2. If the offender is found to be a SVP, he "shall be committed·to the custody of the director of the department of mental health

for control, care and treatment until such time as the person's mental abnormality has so changed that the person is safe to be at large." Section 632.495.2.

From the documents he reviewed, Dr. Mandracchia noted a "relatively early onset of sexual abuse" perpetrated against Appellant, including indications of sexual abuse "by his older brothers" and "from a neighbor friend of the family." He also observed information in the records which suggested that Appellant had engaged in sexual activity "at an early age" and did so "with what would otherwise be considered inappropriate partners." The records also revealed that Appellant, when sixteen years old, was involved in a sexual misconduct matter with a thirteen-year-old girl that was dealt with in "juvenile court[.]" The consequences flowing from that matter included "house arrest[.]" Other records revealed that, while a youth, Appellant abused solvents or gasoline by "huffing" (breathing in their fumes).

Dr. Mandracchia also saw indications of "non-sexual" criminal history relating to allegations of "burglaries, thefts, shoplifting, [and] tamperings." This was important to him in conducting his evaluation because the behavior "show[ed] two potential things. One, a disregard for authority. Disregard for the law which predisposes someone to again continue to disregard. And perhaps a lack of regulation and control of one's own behavior." The records revealed "repeated probations" and offenses that were eventually "adjudicated to the adult court" and ultimately led to Appellant's incarceration in the Department of Corrections ("DOC").

"[A] handful of days at most" after his release from prison, Appellant had sexual contact with an intoxicated female cousin who was "[f]ourteen and a half" in December 1999. Appellant pleaded guilty to sexual assault as a result of that behavior and was again sentenced to the DOC.

In December 2004, as Appellant was nearing his release date on his four-year sentence for sexual assault, the State filed its petition seeking his civil commitment as a SVP. Before the petition was filed (in July, August, and September 2003), Appellant had exchanged "a series of letters" with I.B., a man Appellant "knew prior to both of them going to the [DOC]." Dr. Mandracchia discussed these letters generally with Appellant in the course of preparing his evaluation. Three letters from Appellant to I.B. and one letter from I.B. to Appellant were admitted into evidence as [State's] Exhibits 5, 6, 7, and 8 without any objection by defense counsel. When asked about the content of Exhibit 5, Dr. Mandracchia said:

The descriptions here as well as the descriptions in—I don't know half a dozen or so of these letters had indications of violence, indications of rape, indications of incest, indications of assault, indications of bestiality, indications of ongoing fantasies about those things and stated intentions to do similar things upon release.

Dr. Mandracchia said the letters also referred to necrophilia. He testified that Exhibit 7 included Appellant's graphic description of his "taking [sexual] advantage of an older gentleman who was apparently [Appellant's] cellmate at the time." The letter also included "incestuous ideas, relationships with a sister[,]" and "ideas of future such actions." Dr. Mandracchia said that Exhibit 8 discussed "ideations and fantasies about rape, and taking advantage of an older fellow prisoner." He testified that the letter also included "references to raping and or killing."

Dr. Mandracchia estimated that he had performed 30 to 35 sexually violent predator evaluations and that he would "once in a while" see similar content in other letters he had reviewed. But he also stated, "I don't know that I have seen anything to this extent and this explicit." Based upon

his experience, Dr. Mandracchia outlined three possibilities concerning Appellant's letters:

> I can't think of anything good. It means that either we have somebody who generally has these paraphilias, that genuinely has and I know that the term will come up, you know, sadism—sexual sadism, that is sadistic. Or we have someone who is so cavalier about coming across as one-upmanship that he would put his family on the line like that in writing. Or we have someone who is so hurt and so angered that he would put the metaphorical gun to his families' head, either way, I can't think of one good thing about it. Either way it all concerns me.

The letters were an important part of what Dr. Mandracchia considered in forming his opinion of Appellant. Appellant admitted in his interview with the doctor that he fantasized about "an incestuous relationship with his sister" but explained the content of the letters as reflecting "anger toward people in part due to his own sexual abuse." Appellant also told Dr. Mandracchia that he was "trying to be tougher than [I.B.,] who was corresponding with him." Appellant suggested that he would write such things just to keep up correspondence with someone while he was in solitary confinement. Appellant did write other, non-sexual letters to other individuals around the same time.

Dr. Mandracchia diagnosed Appellant as "suffer[ing] from a mental abnormality in the form of a paraphilia not otherwise specified." The abnormality, in other words, was having "as the object of your sexual attraction something that is not normative . . . or typically not found attractive by the normal population." Dr. Mandracchia testified that two other mental health professionals had diagnosed Appellant as having "sexual sadism." Anoth-

er professional had given Appellant the same diagnosis as Dr. Mandracchia—paraphilia not otherwise specified.

It was Dr. Mandracchia's opinion that Appellant's particular abnormality, by definition, would cause him serious difficulty in controlling his behavior. Dr. Mandracchia testified that:

> [Appellant] engages in behaviors and finds behavior sexually stimulating that most people would not find naturally sexually stimulating. . . . I don't know that he's got skills or emotional capacity or whatever to—certainly doesn't have experience to go ahead and engage in what we would consider to be normal behaviors. And what might very well, in my opinion, predispose him to such a degree to engage in criminal behaviors or sexually violent behaviors by definition.

Dr. Mandracchia also performed a "risk assessment" for Appellant that measured the likelihood of reoffense by "predatory sexual acts of violence." The particular assessment used with Appellant, known as the Static 99–R, looked at "essentially 10 factors" based on actuarial information to predict the risk of reoffending. Scores on the assessment "range somewhere slightly below one to somewhere around 12. On the actuarial [Appellant] comes out with a score of five." This score meant that Appellant "is considered moderate, high risk. And in actual percentages his risk of reconviction for a sexual offense would be between 18, 19 and 30 percent." In addition to the things contained in his assessment, Dr. Mandracchia also considered that Appellant had been diagnosed as having antisocial personality disorder by at least "[t]hree or four . . . mental health professionals," and he agreed with this diagnosis. Dr. Mandracchia saw the diagnosis as an "aggravating" factor for dangerousness and explained, "If you don't

have regard and concern for the feelings of others, you are much more likely to violate those other people's rights. If you don't have regard and respect and concern for the laws of the community, then you are much more likely to break those laws."

In addition, while Appellant may have had some introductory-type classes in the DOC, he had "declined to participate" in more focused sex-offender treatment. He had not completed a sex-offender treatment course, and he had not expressed a need or desire for such treatment. Appellant informed Dr. Mandracchia that "he was not like sex offenders who typically go through sex offender treatment." Appellant told Dr. Mandracchia that "he had come to resolve these things on his own with acknowledging them and discussions with his family. Essentially that treatment would not fit him, and at this point he did not see a need for treatment." Appellant also indicated that people in the prison's treatment center reminded him of a person "who molested him when he was a child."

Dr. Mandracchia believed that Appellant's refusal of treatment and limited insight into his behaviors aggravated his risk for reoffending. He opined that Appellant's other risk factors included a "paucity ... of normal sexual development[,]" "non-sexual criminal offenses that were committed while he was already being sanctioned or supervised for other ones[,]" and "expressed polymorphic paraphiliac interests, fantasies and attentions." Dr. Mandracchia also believed that the fact that Appellant wrote down particular paraphiliac thoughts in detail suggested an increased risk of re-offending. Dr. Mandracchia characterized Appellant's "expressed intent" in his writing as "major for a risk factor."

Dr. Mandracchia did say that Appellant had two "protective" factors that could help decrease his risk. "One was that [Appellant] has not been diagnosed with any severe psychiatric disorder.... [H]e is not cognitively impaired. He is not psychotic, he is not delusional. He doesn't have schizophrenia." Second, "although he has had ... numerous conduct violations when incarcerated," "none of those were for inappropriate sexual behavior." [3]

Based upon his evaluation of Appellant, and the information he obtained during the course of that evaluation, Dr. Mandracchia opined that Appellant's "mental abnormality makes him more likely than not to engage in predatory acts of sexual violence if not confined." He also opined that Appellant "would qualify as a sexually violent predator."

Appellant's expert witness, Dr. Gratzer, also "reviewed a number of records" from juvenile authorities, law enforcement, prosecutor files, victims, prison records, other evaluations, depositions, and the "Static 99" assessment in the course of his evaluation of Appellant in 2006 and 2011. Dr. Gratzer—who did not regard antisocial personality disorder as "meet[ing] the criteria for a mental abnormality that would predispose you to committing predatory sexual acts of violence"—agreed that "there certainly is evidence that [Appellant] has shown antisocial personality traits if not the disorder." We will discuss additional testimony provided by Dr. Gratzer in our analysis of Appellant's point.

Appellant testified on his own behalf. He initially admitted that he had sexual contact with one of his sisters when he was younger and eventually admitted that they "actually had sex." Appellant said that he did not want to attend treatment in prison

---

**3.** It appears from a quotation of State's Exhibit 8 that the cellmate was transferred be-

fore Appellant completed the acts discussed in his correspondence.

"because of what happened to [him] as a child," the people in treatment had abused children, and he "[c]ouldn't be around them people." As a result, he signed a "refusal paper."

During its deliberations, the jury requested "the letters written by [Appellant]." Counsel for Appellant questioned whether both versions of an excerpt of one of the letters should be submitted to the jury, but otherwise voiced no objection to the jury's request.[4] Three letters from Appellant to I.B. and one letter from I.B. to Appellant, [State's] exhibits 5, 6, 7, and 8, were delivered to the jury. Four letters from Appellant, Appellant's exhibits 1, 2, 6 and 7, that had also been received into evidence, were also delivered to the jury in response to its request. The jury found Appellant to be a sexually violent predator, and the trial court entered a judgment committing him to the Department of Mental Health as set forth above.

Appellant timely filed a "Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial" ("new trial motion"). It asserted, among other things, that the trial court erred in denying Appellant's motion for directed verdict because the evidence was insufficient as a matter of law; that Dr. Mandracchia testified that Appellant suffered from paraphilia, not otherwise specified, but admitted that this diagnosis was controversial as being "too vague"; that the State "failed to produce admissible evidence that [Appellant] was a sexually violent predator under Missouri law"; and that the "verdict was against the greater weight of the credible, reliable evidence presented at trial[.]" The new trial motion did not specifically assert that "the jury relied on speculation and emotion by basing its verdict on correspondence between [Appellant] and [I.B.]" as now alleged in his point relied on. After the trial court denied the motion for new trial, this appeal timely followed.

## Analysis

■ In his multifarious point relied on, Appellant contends the trial court erred in committing him to the Department of Health because

the evidence was insufficient to clearly and convincingly prove that [Appellant] met the definition of a sexually violent predator according to Missouri law because the verdict was against the weight of the evidence and the jury relied on speculation and emotion by basing its verdict on correspondence between [Appellant] and [I.B.] and the testimony of [Dr. Mandracchia].

For ease of analysis, we address his various contentions out of order.[5]

### The weight of the conflicting evidence

Although Appellant recognizes that an appellate court does not act as a "'super juror,'" citing *State v. Grim*, 854 S.W.2d 403, 414 (Mo. banc 1993), he nonetheless asserts that the evidence presented by the State is insufficient "to tip the scales in the affirmative" when weighed against the evidence favorable to Appellant. He argues

4. Defense counsel did not identify on the record which letter he questioned except to state that one read, "I won't off them" and the other read, "I want to." Dr. Gratzer was questioned regarding one copy of a letter from Appellant indicating that he "won't off him" in an apparent reference to a friend of the victim of Appellant's sexual assault and another copy of the letter that defense counsel suggested had been altered to say "I want to

off him." It appears that both versions were submitted to the jury.

5. A point that claims more than one claim of error is in violation of Rule 84.04(d), Missouri Court Rule (2012). Because the rule violation does not impede appellate review, we choose to address Appellant's claims on their merits. *See Citizens Nat'l Bank v. Maries Cnty. Bank*, 244 S.W.3d 266, 272 n. 3 (Mo.App. S.D.2008).

that the evidence favorable to him—which included Dr. Gratzer's opinion that Appellant did not suffer from paraphilia, that the letters were written due to Appellant being in segregation, Appellant's denial of some sexual attractions, and Appellant's own efforts "to come to terms with both his abuse and his offenses"—was more persuasive than the State's evidence.

■ Because the trial judge was in a much better position to decide such a claim, we are rightly prohibited from doing so. "The trial court's denial of a motion for new trial challenging the verdict [in a jury case] as against the weight of the evidence is a conclusive determination that cannot be overturned on appeal." *Woods v. Friendly Ford, Inc.*, 248 S.W.3d 699, 705 (Mo.App. S.D.2008). "This court cannot rule on the weight of evidence in a jury tried case." *George v. Eaton*, 789 S.W.2d 56, 61 (Mo.App. W.D.1990). The trial court's ruling on the matter is dispositive; this portion of Appellant's point fails. *See Woods*, 248 S.W.3d at 705.

*Jurors' alleged "emotional response" to Appellant's letters*

■ Appellant did not object at trial to the admission of his correspondence with I.B., and he does not argue its admissibility on appeal. Instead, he now asserts— for the first time—that "[t]he letters were read to the jury to focus on the jurors' emotional response to the context of the letters." Appellant included no such claim in his new trial motion.

"In a jury-tried case, an appellant must raise the alleged error in a motion for new trial in order to preserve the issue for appellate review. *Rule 78.07(a)(1)*." *Vance Bros., Inc. v. Obermiller Constr. Serv., Inc.*, 181 S.W.3d 562, 564 n. 3 (Mo. banc 2006). (Emphasis as stated in original.) As a result, the alleged error is not preserved for our review, and this portion of Appellant's point also fails.[6]

*Sufficiency of the evidence*

■ When reviewing the sufficiency of the evidence in a SVP case, we deter-

---

6. Issues not preserved for review may be considered for plain error review under Rule 84.13(c). *Flood ex rel. Oakley v. Holzwarth*, 182 S.W.3d 673, 676 (Mo.App. S.D.2005). Appellant has not requested plain error review of his claim, and he did not deposit the exhibits at issue (the complained-of letters) with this court. As a result, we would generally presume that their content would not support his claim. *State v. Davis*, 242 S.W.3d 446, 449 n. 1 (Mo.App. S.D.2007); *see also Gage v. Morse*, 933 S.W.2d 410, 424 (Mo.App. S.D.1996). No such presumption would be necessary here. Dr. Mandracchia testified that he considered the letters important in his evaluation of Appellant. Thus, the letters had probative value in helping the jury evaluate Dr. Mandracchia's assessment of Appellant's risk to reoffend. As a result, they would have been admissible even if Appellant had objected to their admission. *Cf. In re Care & Treatment of Wadleigh v. State*, 145 S.W.3d 434, 438 (Mo.App. W.D.2004) (probative value of evidence regarding respondent's violent statements and references to genitalia made in connection with prior telephone harassment charge outweighed any prejudice as respondent objected to only a portion of the testimony and experts testified that the urge to make calls was also reflective of respondent's urge to molest children).

Appellant cites no evidence supporting his claim that the reading of his correspondence with I.B. to the jury resulted in any "emotional response" from it. Appellant also cites no controlling authority in support of his claim that otherwise admissible evidence would be erroneously received due to such an "emotional response" if it had occurred, relying instead on a discussion by Judge Wolff in his concurring opinion in *In re Care & Treatment of Norton*, 123 S.W.3d 170, 177–78 (Mo. banc 2003), that the "reprehensible nature of the offenses" involved and the jury's reaction to such information brings into question the wisdom of relying on jury trials for such cases. Evidence demonstrating that someone is a SVP may include some material that is very disconcerting to jurors, and we presume, *arguendo*, that this would be true of Appellant's correspondence with I.B. But,

mine "whether there was sufficient evidence admitted from which a reasonable jury could have found each necessary element by clear and convincing evidence." *A.B.*, 334 S.W.3d at 752. The jury determines witness credibility and the weight to be given to testimony presented to it; we do not reweigh the evidence. *Id.* "For that reason, the evidence is viewed in the light most favorable to the judgment, accepting as true all evidence and reasonable inferences favorable to the judgment and disregarding all contrary evidence and inferences." *Id.* "We will reverse a judgment based on insufficiency of the evidence only if there is a complete absence of probative facts supporting the judgment." *In re Care & Treatment of Barlow v. State*, 250 S.W.3d 725, 733 (Mo.App. W.D.2008).

After Dr. Mandracchia discussed the Static 99–R risk assessment and other factors of particular significance to his evaluation of Appellant's mental disorder and likelihood of reoffense, he opined that Appellant "suffered from a mental abnormality in the form of a paraphilia not otherwise specified"—an abnormality that made it seriously difficult for Appellant to control his behavior. He opined that Appellant was "more likely than not to engage in

predatory acts of sexual violence if not confined." Dr. Mandracchia "explained the test results and other bases supporting [those] expert conclusions." *See In re Care & Treatment of O'Hara*, 331 S.W.3d 319, 320 (Mo.App. S.D.2011) (finding this alone sufficient to preclude an appellate court from finding a complete absence of probative facts supporting a verdict). Because it was up to the jury to determine the credibility of the witnesses, Dr. Gratzer's contrary opinion does not diminish the probative value of Dr. Mandracchia's testimony.[7] *See Barlow*, 250 S.W.3d at 733–34. The jury also had probative evidence of Appellant's ability to control his behavior in the form of Appellant's own testimony that he did not have any need for sex offender treatment and had no intention of engaging in it.

The evidence adduced at trial was sufficient to allow a reasonable fact-finder to find that Appellant was a SVP by clear and convincing evidence. Appellant's point is denied, and the judgment is affirmed.

ROBERT S. BARNEY, J., DANIEL E. SCOTT, P.J., concur.

it is also true that jurors, when properly instructed and educated, have shown the ability to get past their initial emotional responses. If that were not the case, the criminal justice system would not be able to impartially try those charged criminally with having committed horrible, shocking and abominable crimes.

*State ex rel. Nixon v. Askren*, 27 S.W.3d 834, 840 (Mo.App. W.D.2000).

7. Dr. Gratzer testified that "[Appellant] doesn't meet the DSM–IV for criteria for paraphilias." He also opined that Appellant did not have a sexual disorder, and he did not have a mental abnormality. Dr. Gratzer ruled out paraphilia because he regarded Ap-

pellant's sexual behavior as "three incidences where he is having consensual sex with underage—with women who are—with girls who are two or three years younger who are underage or who can't legally consent." He testified that "literature" and "clinical experience" suggest that a person "who commit[s] those types of offense[s]" "do not have a higher risk than a normal person of sexually re-offending or if it is higher it is minimally higher, and that's with or without treatment." He also thought that "two letters" written by Appellant "might have very little significance and be completely inconsistent with what someone would do if he had sexual sadism or rape fantasies."